UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 5, 2015

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Number: |
| | Grand Jury Original |
| v. | Violations: |
| JAMES POWERS, | 42 U.S.C. § 7413(c)(1) (Clean Air Act); |
| | 42 U.S.C. § 7413(c)(4) (Clean Air Act); |
| | 18 U.S.C. § 1343 (Wire Fraud); |
| Defendant. | 18 U.S.C. § 2 (Aiding and Abetting, Causing an Act to be Done); |
| | 22 D.C. Code §§ 3221(a), 3222(a)(1) (First Degree Fraud). |
| | Forfeiture: |
| | 18 U.S.C. § 981(a); 28 U.S.C. § 2461(c). |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE

**(Clean Air Act - Failure to Notify Prior to Renovation)**

At all times material to this Indictment:

### Introduction

1. The defendant JAMES POWERS ("POWERS") was the president of a real estate investment firm ("Company A") located in Bethesda, Maryland; Company A was primarily owned and controlled by persons other than POWERS.

2. A company identified in these proceedings as "Company B" was a real estate development firm located in Washington, D.C.

3. The Maples DC, LLC was a corporation created by Company A and Company B, and was incorporated in Delaware. The vast majority of the beneficial ownership interest in The Maples DC, LLC accrued to investors with funds under the management of Company A.

4. Larry Miller ("Miller") was a home renovation contractor in Atlanta, Georgia.

5. Asbestos is a group of naturally occurring minerals made up of microscopic bundles of fibers. Asbestos is known to cause life-threatening illnesses. Asbestos has been defined by Congress as a hazardous air pollutant. 42 U.S.C. § 7412(b)(1). Congress has found that medical science has established no minimum level of exposure to asbestos fibers that is safe for those exposed. 20 U.S.C. § 3601(a)(3).

### The Clean Air Act

6. The Clean Air Act authorized the United States Environmental Protection Agency ("EPA") to establish "work practice standards" that must be followed to ensure the safe and proper handling and removal of asbestos during renovation work. Title 42, United States Code ("U.S.C.") Section 7412(h)(1). These asbestos work practice standards apply to an "owner or operator of a demolition or renovation activity" at a "facility" where the combined amount of "regulated asbestos-containing material" ("RACM") on facility components to be stripped, removed, dislodged, cut, drilled or similarly disturbed is at least 260 linear feet on pipes or at least 160 square feet on other facility components. Title 40, Code of Federal Regulations ("C.F.R.") Section 61.145(a). An "owner or operator of a demolition or renovation activity" means any person who owns, leases, operates, controls, or supervises the facility being demolished or renovated, or any person who owns, leases, operates, controls, or supervises the demolition or renovation operations, or both. 40 C.F.R. § 61.141. "Renovation" means altering a facility or one or more facility components in any way. *Id.* A "demolition" is an operation in

which load-supporting structural members are wrecked or taken out. *Id.* The term "facility" includes "any institutional, commercial, public, industrial, or residential structure, installation, or building." *Id.*

7. According to federal law, RACM means "friable asbestos material" or asbestos-containing material ("ACM") that can become friable as a result of renovation activities. 40 C.F.R. § 61.141. "Friable asbestos material" means any material containing more than one percent (1%) asbestos as determined by approved EPA methodologies that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure. 40 C.F.R. § 61.141.

8. The asbestos "work practice standards" include the following:

   a. the owner or operator must cause the affected facility to be "thoroughly inspected" – *i.e.*, "surveyed" – for the presence of asbestos, 40 C.F.R. § 61.145(a);

   b. the owner or operator must remove all RACM from a facility being demolished or renovated before any activity begins that would break up, dislodge, or similarly disturb the material or preclude access to the material for subsequent removal, 40 C.F.R. § 61.145(c)(1);

   c. the owner or operator must have present during the renovation or demolition project a foreman, management-level person, or other authorized representative who is trained in compliance with the asbestos regulations, 40 C.F.R. § 61.145(c)(8);

   d. the owner or operator must cause friable asbestos materials to be adequately wetted when removed from the facility, 40 C.F.R. § 61.145(c)(2), or when being stripped from facility components, 40 C.F.R. § 61.145(c)(3);

  e. the owner or operator must cause removed friable asbestos materials to be carefully lowered to the floor and to ground level, without dropping, throwing, sliding, or otherwise damaging or disturbing the RACM, and must wet or contain the removed friable asbestos materials in leak-tight wrapping, 40 C.F.R. § 61.145(6); and

  f. the owner or operator must provide the EPA Administrator, and any other entity to whom EPA has delegated authority, with written notice of the intention to renovate or demolish a facility containing RACM ten days before the activity begins, 40 C.F.R. § 61.145(b).

9.  Regulations promulgated by the Occupational Safety and Health Administration ("OSHA") prescribe: that protective gear must be provided to asbestos removal workers; the licensing requirements for such workers and supervisors; and the air monitoring and sampling requirements that must be conducted before, during, and after such removal. These requirements provide that:

  a. individuals supervising the removal of RACM must be properly accredited to do so;

  b. individuals conducting the removal of RACM must wear protective gear during removal activities to include properly fitted respirators and protective suits as set forth in 29 C.F.R. § 1926.1101;

  c. each employer conducting specified types of asbestos removal work must have air monitoring analysis performed during the work to accurately determine the airborne concentration of asbestos to which employees may be exposed. Such air analysis is referred to herein as "OSHA Personals." To

conduct air analysis on OSHA Personals, analysts must be trained in and utilize required methodologies set by the National Institute of Safety and Health. Each air monitor must be given a respirator and fit tested for its use, pursuant to OSHA regulations. See 29 C.F.R. § 1926.1101; and

   d. asbestos removal workers and supervisors must complete training pursuant to the Asbestos Hazard Emergency Response Act of 1986 ("AHERA"). AHERA requires special accreditation for certain individuals dealing with friable asbestos-containing material in commercial buildings.

10. The Clean Air Act also authorized the EPA to establish "disposal requirements" that must be followed to ensure the safe and proper disposal of asbestos during and after renovation work. The disposal requirements apply to an owner or operator of a renovation operation. An owner or operator of a facility whose renovation activities produce asbestos-containing waste material is also called a "waste generator." 40 C.F.R. § 61.141.

11. The asbestos "disposal requirements" for the owner or operator of the facility include the following:

   a. the owner or operator must not discharge visible emissions to the outside air during the collection, processing, packaging, or transporting of asbestos-containing waste material, 40 C.F.R. § 61.150(a);

   b. the owner or operator must cause friable asbestos materials that have been removed or stripped to remain adequately wetted until they are packed and sealed in leak-tight containers or wrappings, 40 C.F.R. § 61.150(a)(1)(iii);

   c. the owner or operator must cause friable asbestos waste containers transported off the facility site to be marked with labels that state the name

of the asbestos waste generator and the location at which the waste was generated, 40 C.F.R. § 61.150(a)(1)(v);

   d. the owner or operator must maintain waste shipment records that contain:

      i. the name, address, and telephone number of the waste generator;

      ii. the name and address of the local state or EPA Regional office responsible for administering the asbestos National Emission Standards for Hazardous Air Pollutants ("NESHAP") program;

      iii. the approximate quantity in cubic meters (cubic yards);

      iv. the name and telephone number of the disposal site operator;

      v. the name and location of the disposal site;

      vi. the date transported;

      vii. the name, address, and telephone number of the transporters; and

      viii. a certification that the contents of the consignment are fully and accurately described by proper shipping name and are classified, packed, marked, and labeled, and are in all respects in proper condition for transport by highway according to applicable international and government regulations, pursuant to 40 C.F.R. §§ 61.150(d)(1) through (5); and

   e. the waste generator must deposit friable ACM and other components containing or covered with ACM as soon as practical at a disposal site authorized to accept asbestos, 40 C.F.R. § 61.150(b).

12. The District of Columbia and the states are permitted to develop a program for the implementation and enforcement of Clean Air Act Emission Standards and other requirements of

42 U.S.C. § 7412. EPA must review and approve these programs. A program may provide for partial or complete delegation of EPA's authority to implement and enforce Clean Air Act Emission Standards and prevention requirements, but shall not include authority to set standards less stringent than those set by EPA. 42 U.S.C. § 7412(l)(1).

13. EPA has delegated authority to the District of Columbia to administer and enforce the work practice standards for asbestos. 40 C.F.R. § 61.04(b)(J). The District of Columbia has adopted the federal standards by reference. D.C. Mun. Regs. Tit. 20, § 800. The District of Columbia has further delegated its authority to administer and enforce the work practice standards for asbestos to the Air Quality Division of the District Department of the Environment ("DDOE"). Mayor's Order 2006-61, Paragraphs III(22) and III(29)(4)(e) (June 14, 2006). The delegation of authority to a state does not prohibit EPA from enforcing any applicable federal emission standard or requirement. 42 U.S.C. § 7412(l)(7).

### Background

14. In March 2010, Company A partnered with Company B to purchase the Maples, a historic property located at 619 D Street, SE, Washington, D.C. ("the Maples property"). The two companies formed a corporation called The Maples DC, LLC, which was incorporated in the District of Columbia. Company A's investor-clients provided about 90% of the capital and funding for the project, and held a similar ownership share in The Maples DC, LLC. The redevelopment plans included extensive renovation of the property, which constituted a "facility" under Clean Air Act regulations. 40 C.F.R. § 61.141.

15. In or about March 2010, The Maples DC, LLC, hired a consultant to conduct an environmental survey of the facility (the "Phase I Survey") and a specific asbestos and lead paint survey ("asbestos survey"). The asbestos survey documented RACM at the Maples property,

7

including in floor tiles and mastic, wall board, joint compound, and pipe insulation, in quantities requiring "abatement," that is, meaning removal in accordance with the rules and regulations, prior to renovation activity under the Clean Air Act.

16. At various times between in or about November 2010 and August 2011, The Maples DC, LLC, solicited and received bids to abate the RACM identified in the asbestos survey and to conduct the removal of interior fixtures, flooring, walls, ceilings, and other materials at the Maples property. This work was referred to in the bids and by representatives of Company A and Company B as "demolition" or "interior demolition."

17. In or about August 2011, POWERS hired Miller to conduct "demolition" of the interior materials as part of the renovation activity at the Maples property. Neither POWERS, nor Miller, nor anyone employed by or working with them, was a licensed asbestos abatement contractor, had training in asbestos remediation, or had any experience abating asbestos. The written contract with Miller specifically "exclude[d] removal of asbestos" from the Maples property.

18. Previously, POWERS told Miller that there was asbestos-containing pipe wrap in the building, including in the crawl space, and pointed out certain of those pipes to Miller. POWERS told Miller that the asbestos would be abated by another contractor after Miller's work, and instructed Miller not to touch the pipe wrap in the course of his work. POWERS failed to inform Miller of asbestos that was present elsewhere in the building, including in the tile, wall board, and joint compound on drywall sheeting.

19. During the period between August 2011 and October 2011, at the direction of POWERS, Miller and his workers began the renovation of the interior materials at the Maples property. Specifically, Miller and his workers completely removed most of the interior materials

from the Maples property, including various portions of floor tiles and mastic, wall board, joint compound, and pipe insulation, including portions which contained asbestos. Miller and his workers did not conduct asbestos abatement.

20. POWERS was aware that the building contained asbestos that had not been abated prior to commencing renovation activity.

21. On or about September 1, 2011, POWERS contracted with a waste disposal company to haul construction debris from the Maples property off-site. POWERS failed to inform the waste disposal company that the construction debris from the Maples property contained asbestos. The RACM was not taken to a disposal site qualified to receive asbestos waste.

22. In or about early September 2011, as Miller and his workers worked at the Maples property, POWERS submitted a proposal to members of The Maples DC, LLC, under the name of "FEM IX, LLC d/b/a Capitol Demolition Company" ("FEM IX"). The proposal stated that FEM IX would "remove and dispose of the asbestos containing materials as identified in the [asbestos] survey and perform a complete gut demolition of interior material," "in accordance with all applicable local, EPA, and OSHA regulations." POWERS was the sole owner of FEM IX, but Company B's members were not aware that POWERS was involved with FEM IX at all. On or about September 8, 2011, a representative of Company B signed the FEM IX contract on behalf of The Maples DC, LLC.

23. On or about September 21, 2011, a DDOE employee conducted an inspection at the Maples property, and observed workers doing renovation work, consisting of the removal of interior materials, amidst suspected asbestos. Miller contacted POWERS by telephone and told

him that the DDOE employee had raised concerns about suspected asbestos at the Maples property.

24. Between on or about September 21, 2011, and on or about October 26, 2011, POWERS corresponded with DDOE employees by email. Despite DDOE requests for an asbestos survey of the site, POWERS did not provide the March 2010 asbestos survey, which he possessed. Although POWERS also indicated by email on September 22, 2011, to DDOE that work would stop at the Maples property that day, POWERS never instructed Miller to stop working. With POWERS's knowledge, Miller and his workers continued renovation at the Maples property during this period.

25. From at least in or about August 2011, through and including in or about October, 2011, within the District of Columbia and elsewhere, the defendant,

JAMES POWERS,

owner and operator of a renovation activity at the Maples facility that did and would disturb and remove at least 160 square feet and at least 260 linear feet of RACM from facility components, did knowingly fail and cause others to fail to provide written notification to EPA and DDOE at least 10 days before asbestos stripping or removal work and any other activity began at the Maples facility, in violation of the work practice standard found at Title 40, Code of Federal Regulations, Section 61.145(b) and incorporated by D.C. Mun. Regs. Tit. 20, § 800.

**(Clean Air Act - Failure to Notify Prior to Renovation, and Aiding and Abetting, Causing an Act to be Done, in violation of Title 42, United States Code, Section 7413(c)(1); Title 18, United States Code, Section 2; and Title 40, Code of Federal Regulations, Section 61.145(b)).**

## COUNT TWO

### (Clean Air Act - Failure to Remove Prior to Renovation)

26. Paragraphs 1 through 24 of this Indictment are re-alleged and incorporated as if fully set forth herein.

27. From at least in or about August 2011, through and including in or about October 2011, within the District of Columbia and elsewhere, the defendant,

### JAMES POWERS,

was an owner and operator of a renovation activity at the Maples facility that did and would disturb or remove at least 160 square feet and at least 260 linear feet of RACM from facility components, and did knowingly fail and cause others to fail to remove all RACM from the Maples facility prior to activity that would break up, dislodge, disturb, and cause the breaking up, dislodgement, and disturbance of RACM, in violation of the work practice standard found at Title 40, Code of Federal Regulations, Section 61.145(c)(1) and incorporated by D.C. Mun. Regs. Tit. 20, § 800.

**(Clean Air Act - Failure to Remove Prior to Renovation, and Aiding and Abetting, Causing an Act to be Done, in violation of Title 42, United States Code, Section 7413(c)(1); Title 18, United States Code, Section 2; and Title 40, Code of Federal Regulations, Section 61.145(c)(1)).**

## COUNT THREE

### (Clean Air Act - Failure to Have Trained On-Site Representative)

28. Paragraphs 1 through 24 of this Indictment are re-alleged and incorporated as if fully set forth herein.

29. From at least in or about August 2011, through and including in or about October 2011, within the District of Columbia and elsewhere, the defendant,

### JAMES POWERS,

owner and operator of a renovation at the Maples facility that did and would disturb and remove at least 160 square feet and at least 260 linear feet of RACM from facility components, did knowingly strip, remove, and otherwise handle and disturb, and caused to be stripped, removed, and otherwise handled and disturbed, RACM at the Maples facility without the presence of at least one on-site representative trained in the asbestos work practice requirements and the means of complying with them, in violation of the work practice standard found at Title 40, Code of Federal Regulations, Section 61.145(c)(8) and incorporated by D.C. Mun. Regs. Tit. 20, § 800.

**(Clean Air Act - Failure to Have Trained On-site Representative and
Aiding and Abetting, Causing an Act to be Done, in violation of Title 42,
United States Code, Section 7413(c); Title 18, United States Code, Section 2; and
Title 40, Code of Federal Regulations, Section 61.145(c)(8)).**

## COUNT FOUR

### (Clean Air Act - Negligent Endangerment)

30. Paragraphs 1 through 24 of this Indictment are re-alleged and incorporated as if fully set forth herein.

31. From at least in or about August 2011, through and including in or about October 2011, within the District of Columbia and elsewhere, the defendant,

### JAMES POWERS,

did negligently release and cause to be released into the ambient air a hazardous air pollutant, that is, asbestos and RACM, and in doing so, at the time of that release, negligently placed and caused another person to be placed in imminent danger of death or serious bodily injury.

**(Clean Air Act - Negligent Endangerment, and Aiding and Abetting, Causing an Act to be Done, in violation of Title 42, United States Code, Section 7413(c)(4) and Title 18, United States Code, Section 2).**

## COUNTS FIVE AND SIX

### (Wire Fraud)

32. Paragraphs 1 through 24 of this Indictment are re-alleged and incorporated as if fully set forth herein.

33. From in or about August 2011, through in or about May 2012, in the District of Columbia and elsewhere, the defendant,

JAMES POWERS,

did knowingly and willingly devise and intend to devise a scheme and artifice to defraud and to obtain monies by means of materially false and fraudulent pretenses, representations, and promises.

34. It was part of the scheme that POWERS would and did obtain funds belonging to The Maples DC, LLC for his personal use and benefit by purporting to provide asbestos abatement and renovation at the Maples facility through FEM IX, when in truth and in fact FEM IX was not qualified to provide, and did not provide, such services and, further, without disclosing that POWERS owned and controlled FEM IX. Specifically, among other things:

    a. POWERS was aware that asbestos was present at the Maples property, and that The Maples DC, LLC, had received bids from licensed professional asbestos abatement and renovation firms located in the DC area.

    b. POWERS knew that Miller was not qualified to perform asbestos abatement. Nonetheless, POWERS proposed to his partners at Company B that Miller conduct abatement and renovation activities at the Maples property. POWERS's partners at Company B expressed reservations about Miller's qualifications to perform the work, and told POWERS that it was important to hire someone licensed and qualified to perform asbestos abatement.

c. POWERS ultimately hired Miller to conduct renovation activity at the Maples property, specifying in his contract with Miller that Miller was not responsible for abating asbestos.

d. POWERS obtained copies of bids for asbestos abatement and renovation (which bids The Maples DC, LLC, had previously received from other firms), and created his own bid and proposed contract, under the name of "FEM IX, LLC d/b/a Capital Demolition Co.," for purported asbestos abatement and renovation at the Maples facility. The bid and proposed contract contained language virtually identical to that used in bids from other firms, and offered a price below those offered by the other firms. The bid and proposed contract stated that FEM IX would "remove and dispose of the asbestos containing materials as identified in the [asbestos] survey and perform a complete gut demolition of interior material," "in accordance with all applicable local, EPA, and OSHA regulations."

e. After Miller had commenced renovation activity at the Maples property, with POWERS's knowledge and without any asbestos abatement activity or preparation therefor having occurred, POWERS submitted the FEM IX bid and proposed contract to his partners at Company B by email.

f. POWERS's bid and proposed contract were materially false and fraudulent in that POWERS did not, in fact, remove and dispose of the asbestos at the Maples property in accordance with all applicable local, EPA, and OSHA regulations, in that POWERS did not intend to do so, and in that POWERS

      concealed, omitted, and did not indicate to his partners at Company B that POWERS was associated with, let alone the sole owner of, FEM IX.

g. POWERS instructed his partners to pay money from The Maples DC, LLC, to FEM IX pursuant to the bid and contract, notwithstanding that Miller's work did not include abating, disposing of, and removing the asbestos at the Maples property "in accordance with all applicable local, EPA, and OSHA regulations" as represented by POWERS in the contract with The Maples DC, LLC.

h. POWERS caused Miller to establish a new bank account for purposes of receiving funds from POWERS and FEM IX as payment for the work Miller performed at the Maples property. POWERS then paid Miller funds for the work Miller performed at the Maples property.

i. During the course of the renovation activity, POWERS requested that Miller perform additional work on the property, to include removing a stump, a basketball court, and a walkway, and building a fence, among other tasks. Miller and POWERS signed a "Scope of Work Modification" in which POWERS agreed to pay Miller $8,000 for this additional work.

j. After completion of the additional work on the property, POWERS requested that Company B pay FEM IX the cost of the Scope of Work Modification, and provided an altered version of the Scope of Work Modification. The altered version was false and fraudulent in that it bore a forged signature of Miller and stated that the cost of the additional work was $17,500, not $8,000, and in that POWERS continued to conceal, omit, and not indicate to his partners at

Company B that POWERS was associated with, let alone the sole owner of, FEM IX.

## The Execution of the Scheme

35. On or about each of the dates set forth below, in the District of Columbia and elsewhere, for the purpose of executing and attempting to execute the scheme described above, the defendant,

JAMES POWERS,

transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings and signals described below for each count, each transmission constituting a separate count:

| COUNT | DATE | DESCRIPTION OF WIRE | LOCATION OF WIRE |
|---|---|---|---|
| 5 | Sept. 2, 2011 | Digital transmission recording the deposit of two $3,000 checks from POWERS to Miller into a new Miller bank account at United Bank | From the District of Columbia to Virginia |
| 6 | Sept. 8, 2011 | Email from POWERS attaching the bid and proposed contract stating that FEM IX would "remove and dispose of the asbestos containing materials as identified in the [asbestos] survey and perform a complete gut demolition of interior material," "in accordance with all applicable local, EPA, and OSHA regulations" | From Maryland to the District of Columbia |

**(Wire Fraud and Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1343 and 2).**

## COUNT SEVEN

### (First Degree Fraud)

36. Paragraphs 1 through 24 of this Indictment are re-alleged and incorporated as if fully set forth herein.

37. From in or about August 2011, through in or about May 2012, within the District of Columbia, the defendant, JAMES POWERS, engaged in a scheme and systematic course of conduct with intent to defraud and to obtain property of The Maples DC, LLC by means of false and fraudulent pretenses, representations, and promises, and thereby obtained property and caused The Maples DC, LLC to lose property, the value of which is $1,000 or more, that is, payments totaling over $150,000 between in or about August 2011 and May 2012 under the false and fraudulent contract with FEM IX to abate asbestos at the Maples facility, which funds belonged to The Maples DC, LLC.

**(First Degree Fraud, in violation of 22 D.C. Code, Sections 3221(a), 3222(a)(1)).**

## FORFEITURE ALLEGATION

38. Upon conviction of any of the offenses alleged in Counts Five and Six, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

39. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c)).

A TRUE BILL:

FOREPERSON

*Channing D. Phillips/MD*
ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA